IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 25-cr-20341-MSN-tmp |
| | ) | |
| | ) | |
| ORRECE LYONS, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

Before the court by order of reference is Defendant Orrece Lyons's Motion to Suppress, filed January 20, 2026. The government filed their response in opposition on February 2, 2026. For the reasons below, the undersigned recommends that Lyons's Motion to Suppress be denied.

## I.    PROPOSED FINDINGS OF FACT

The following proposed findings of facts are based on the undisputed facts set forth in the parties' briefs, as well as evidence presented at the suppression hearing. (ECF Nos. 22, 25, 26.) At that hearing, the court heard testimony from Shelby County Sheriff's Office Deputy Bryson Johnson, whom the undersigned finds credible. The court also received into evidence the video footage taken from Deputy Johnson's body-worn camera, which captured the initial encounter, detention, and subsequent search of Lyons's and

his vehicle, and several still shots from that footage. (ECF No. 27.)

On December 2, 2024, at approximately 11:05 p.m., the Shelby County Sheriff's Office responded to a noise complaint at 7941 Meadow Vale Drive, in Memphis, Tennessee. Upon arrival, deputies observed a black sedan playing loud music parked in the driveway of 7941 Meadow Vale Drive. The car was parked facing the front of the house and there was an individual in the driver's seat. The deputies parked a few houses away and approached the black sedan on foot. Deputy Johnson's body camera footage began recording as he and the other deputy approached the vehicle.



*Figure 1*: The black sedan parked in the driveway of 7941 Meadow Vale Drive. (Ex. 4.)

As Deputy Johnson approached from the driver's side of the car, he loudly announced his presence. Defendant Orrece Lyons was

- 2 -

seated in the driver's seat of the black sedan, with the driver's side window down, singing and swaying to loud music. He did not respond to Deputy Johnson's announcement of his presence, but remained where he was, facing forward in the car. Deputy Johnson announced himself again, but Lyons still did not respond and continued to sing and sway to the music. As Lyons continued to sing along to the music, Deputy Johnson observed a gun in Lyons's right hand, which was briefly flashed in Deputy Johnson's direction. (Ex. 1 at 23:05:44.) Although Lyons raised the gun in Deputy Johnson's direction, he did not point the barrel directly at him, nor did it appear that Lyons was aware of the deputy's presence.



*Figure 2*: Gun in Lyons's right hand. (Ex. 7.)

Deputy Johnson immediately drew his own firearm and backed away from the vehicle, ordering Lyons to "drop the gun, G! Drop the gun, brah!" Lyons did not respond to the deputy's commands. Deputy Johnson then called in the incident, and again ordered Lyons to drop the gun multiple times. Lyons then responded by stretching his empty hands out the window of the car and asked, "what gun?" Deputy Johnson then commanded Lyons to get out of his vehicle. Lyons did not initially comply and proceeded to insist that he did not have a gun. Deputy Johnson continued to command Lyons to get out of the car, and Lyons continued to repeat that he did not have a gun, even though Deputy Johnson has just seen Lyons with a gun. Lyons did not make any attempt to exit his vehicle for over a minute. Eventually, he got out of the car and put his hands up. When instructed to turn to face the house, he started to do so, but then instead turned sideways and began opening and closing the car door. As Deputy Johnson continued to tell him to turn around, Lyons started moving around the front of the car and toward the house. The deputy then called at Lyons to stop, but Lyons continued walking and again stated that he did not have a gun. Lyons stopped just before reaching the front door of the house as Deputy Johnson approached him. Deputy Johnson and another deputy pulled Lyons's arms behind his back, and while shouting for Lyons to get on the ground, took him to the ground and handcuffed him.

Deputy Johnson then walked Lyons to his patrol car and informed Lyons that he was not under arrest, but was only being detained for officer safety. Deputy Johnson then patted down Lyons and found a silver Taurus .22 caliber handgun in Lyons's right front pocket. This was not the same gun that Deputy Johnson had seen Lyons holding earlier, inside the car. While standing outside of Lyons's car, deputies observed a small bag inside the vehicle, which was filled with a green, leafy substance that they suspected to be marijuana. The deputies conducted a search of the vehicle and found a pill bottle and another small bag containing a white, rocky substance in the cupholder, and a black Taurus 9 mm handgun in the vehicle's glove box. Officers later ran a criminal record's check, which revealed that Lyons is a convicted felon. A federal grand jury later indicted Lyons for being a felon in possession of the Taurus .22 caliber pistol, in violation of 18 U.S.C. § 922(g)(1).[1]

## II.  PROPOSED CONCLUSIONS OF LAW

The Fourth Amendment protects people "against unreasonable searches and seizures." U.S. Const. amend. IV. "Generally, the Fourth Amendment requires police officers to obtain a warrant prior to conducting a search." United States v. Smith, 510 F.3d 641, 647 (6th Cir. 2007) (citing Maryland v. Dyson, 527 U.S. 465, 466

---

[1]Lyons was not charged for the 9 mm handgun or drugs found inside his vehicle. (See ECF No. 2.)

- 5 -

(1999)); United States v. Doss, No. 1:24-CR-20684, 2025 WL 2158442, at *3 (E.D. Mich. July 30, 2025). However, "[w]hat a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection." Katz v. United States, 389, U.S. 347, 351 (1967); United States v. Fellmy, 165 F.4th 501, 505 (6th Cir. 2026).

**A.   Curtilage**

Lyons first argues that the deputies violated his Fourth Amendment rights by detaining him and searching his person because the vehicle he was sitting in was parked within the curtilage of his home.[2] (ECF No. 22 at PageID 55.) The Fourth Amendment extends protection to the "curtilage" of a person's house. See United States v. Jenkins, 124 F.3d 768, 772 (6th Cir. 1997.) The Supreme Court has identified four factors to consider in determining what constitutes a home's curtilage: (1) the proximity of the area claimed to be the curtilage to the home, (2) whether the area is included within an enclosure surrounding the home, (3) the nature of the uses to which the area is put, and (4) the steps taken by the resident to protect the area from observation by people passing by. United States v. Dunn, 480 U.S. 294, 301 (1987); Mockeridge v. Harvey, 149 F.4th 826, 834 (6th Cir. 2025). The government argues that the Sixth Circuit's decisions in United States v. Estes and

---

[2] At the hearing, the government conceded that Lyons has a privacy interest at the 7941 Meadow Vale Drive residence. (ECF No. 26.)

United States v. Galaviz are instructive here. (ECF No. 25 at PageID 61-62) (citing Estes, 343 F. App'x 97, 101 (6th Cir. 2009) (determining that a driveway was not part of the curtilage of a home because "the area was not enclosed; . . . [the] defendant had not taken any steps 'to protect the area from observation by people passing by;' [and] it was used as a point of entry into the residence, accessible from the adjacent alley."); Galaviz, 645 F.3d 347, 356 (6th Cir. 2011) (holding that no warrant was needed to enter the defendant's driveway, where his car was parked, because it was not enclosed, was only two car lengths long, directly abutted the sidewalk, and no steps had been taken to protect it from observation from passersby)).

The Sixth Circuit has said of Estes and Galaviz that "[b]oth cases involved driveways with similar characteristics to the one here: adjacent to a home, not enclosed, abutting a sidewalk or alley, with no steps taken to obstruct the view of passersby. In both instances, [the Sixth Circuit] held that the officers did not intrude upon the building's curtilage by entering the driveway."[3] United States v. Coleman, 923 F.3d 450, 456 (6th Cir. 2019); Habich v. Wayne Cnty., No. 20-12528, 2022 WL 1569277, at *6 (E.D. Mich.

---

[3]Although both Estes and Galaviz were decided before Florida v. Jardines, 569 U.S. 1 (2013), the Sixth Circuit has determined that they "survive" and may be "factually more on point" in certain cases. See Coleman, 923 F.3d at 456; see also Alberts v. Perry, No. 21-5151, 2021 WL 6503902, at *3 (6th Cir. Oct. 5, 2021).

May 18, 2022), aff'd sub nom. Habich v. Wayne Cnty., Michigan, No. 22-1517, 2023 WL 2911663 (6th Cir. Apr. 12, 2023). The same principles apply here. Much like in Estes and Galaviz, Lyons's driveway was not enclosed, not protected from observation, directly abutted the sidewalk, and was approximately two car lengths long. It was used for parking cars and as a pathway to the entry of the home. Therefore, the driveway was not part of the curtilage of the home.

Lyons cites Collins v. Virginia for the proposition that "the automobile exception does not permit an officer to enter the curtilage of one's home, order an individual out of his vehicle[] on his own property and then arrest an individual." (ECF No. 22 at PageID 55 (citing Collins v. Virginia, 586 U.S. 586 (2018)).) However, this argument assumes that Lyons's vehicle was within the curtilage of the home, which the undersigned has rejected. As the Sixth Circuit has explained, "Collins held that the automobile exception does not allow for a warrantless search of a car parked within a home's curtilage, but it did not hold that all driveways are considered part of the curtilage."[4] Alberts, 2021 WL 6503902, at *3. The undersigned recommends denying the Motion to Suppress on the grounds that the deputies violated Lyons's Fourth Amendment rights by entering the driveway.

---

[4]The court also explicitly held that Estes and Galaviz survive Collins.

**B.    De Facto Arrest**

Lyons argues that he was effectively arrested without a warrant or probable cause when he was handcuffed and searched for weapons. (ECF No. 22 at PageID 55.) A Terry stop, or detention, "must be reasonably related in scope to the circumstances which justified the interference in the first place." United States v. Williams, No. 23-1839, 2024 WL 4543426, at *2 (6th Cir. Oct. 22, 2024) (citing Dorsey v. Barber, 517 F.3d 389, 398 (6th Cir. 2008)). A detention "'must not last longer than necessary to effectuate its purpose' . . . [a]nd an officer should use the 'least intrusive means reasonably available to verify or dispel [her] suspicions in a short period of time.'" Id. (citing Dorsey, 517 at 398). There is no "litmus test" for determining when an investigatory stop becomes a de facto arrest and therefore requires probable cause. Id. Rather, courts in the Sixth Circuit "consider factors such as the length of the detention, the manner in which it was conducted, and the degree of force used." Id. (citing Dorsey, 517 at 399; Smoak v. Hall, 460 F.3d 768, 778 (6th Cir. 2006)).

Here, the undersigned finds that Lyons was not under arrest when he was handcuffed and patted down for weapons. Deputy Johnson expressly stated to Lyons at the time that he was not under arrest, and moreover, the detention was brief, and the manner and degree of force used were reasonable in light of the situation at hand.

- 9 -

Thus, the investigative detention of Lyons did not amount to an arrest until after the firearm was discovered.

## C.    Reasonable Suspicion

Next, Lyons argues that because Tennessee is an open carry state, Deputy Johnson lacked reasonable suspicion that a crime was being committed when he saw Lyons with a firearm on his own property, making "no threat of any nature." (ECF No. 22 at PageID 55-56.) He relies on the Sixth Circuit's decision in Northrup v. City of Toledo Police Dep't, 785 F.3d 1128 (6th Cir. 2015). (Id. at PageID 55.) The government counters that law enforcement officers may approach individuals without any level of suspicion to conduct wellness checks or in response to citizen complaints, which is what they argue the deputies were doing in this case. (ECF No. 25 at PageID 63.) Further, they note that Deputy Johnson only drew his service weapon, escalating the encounter into an investigative stop and detention, after Lyons flashed his firearm and "held [it] in a fire-ready position, pointed near Deputy Johnson's direction[.]" (Id. at PageID 64.) The government argues that this was permissible because when the safety of an officer or another person is reasonably at issue, the officer is permitted to use reasonable force to conduct an investigative stop. (Id. (citing United States v. Hardnett, 804 F.2d 353, 357 (6th Cir. 1986)).)

Tennessee is an open carry jurisdiction, and thus it is lawful for an individual over twenty-one to carry a handgun, openly or

- 10 -

concealed, so long as they lawfully possess the handgun and are in a place where they are lawfully present. T.C.A. § 39-17-1307(g). "[W]here gun possession is presumptively lawful by statute, courts have found that officers lack reasonable suspicion of criminal activity simply because there is a visible firearm." United States v. Davis, No. 21-20373, 2023 WL 7093799, at *3 (E.D. Mich. Oct. 26, 2023) (citing Northrup, 785 F.3d at 1132-33).

In Northrup, police received a call from a concerned passerby about a man walking down the street openly carrying a firearm. 785 F.3d at 1130. Despite being in an open carry jurisdiction, police responded to the call and requested that the man, later determined to be Shawn Northrup, turn around and put his hands over his head. Id. When Northrup proceeded to ask questions rather than comply, the officer approached him, unsnapped his gun from its holster, took temporary possession of it, and detained Northrup. Id. The court determined that under the Fourth Amendment, the officer was required to point to evidence that Northrup was "armed *and dangerous*." Id. at 1132 (emphasis in original). While Northrup was clearly armed, the officer could point to nothing indicating that he was dangerous. Id. Since Northrup was legally permitted to carry the firearm, that fact by itself could not provide a basis to detain him. Id. Thus, the officer had no reasonable suspicion to detain and frisk Northrup, which violated the Fourth Amendment. Id. at 1133-34.

However, in other cases within the Sixth Circuit involving investigatory stops conducted in open carry jurisdictions, the courts have found no Fourth Amendment violations where officers had specific and articulable facts to support a reasonable suspicion that the stopped individual was either engaged in criminal activity or posed a danger to the officers or the public. See, e.g., Embody v. Ward, 695 F.3d 577, 581 (6th Cir. 2012) (finding that although the plaintiff openly carried his firearm in a location he was permitted to, officers had reasonable suspicion to detain him because they reasonably suspected he could be committing a crime); Johnson v. City of Toledo, No. 3:20 CV 497, 2023 WL 6311345, at *4 (N.D. Ohio Sept. 28, 2023) (finding that "the information [police] received [that the plaintiff was waving a gun at residents] was certainly enough to warrant a Terry stop under the reasonable suspicion standard" even in an open carry jurisdiction); Deffert v. Moe, 111 F. Supp. 3d 797, 808 (W.D. Mich. 2015) (explaining that while officers did not suspect the plaintiff of a crime, they had reason to believe that he was a danger to himself and others, which made the Terry stop, which was in an open carry jurisdiction, reasonable); Baker v. Smiscik, 49 F. Supp. 3d 489, 498 (E.D. Mich. 2014) (finding that, although in an open carry jurisdiction, "officers had specific and articulable facts to support a reasonable suspicion of criminal activity" to detain the plaintiff).

- 12 -

The present case differs from Northrup because Lyons did more than simply carry a holstered pistol—he held the gun and flashed it in the direction of Deputy Johnson. Additionally, unlike in Northrup, the government does not argue that Deputy Johnson had reasonable suspicion to believe Lyons was going to commit a crime. Rather, the government argues that there was reasonable suspicion that Lyons might be a danger to himself or others. (ECF No. 25 at PageID 63-64.)

The combination of Lyons's lack of response to Deputy Johnson's announcing his presence, sitting in his car at close to midnight singing and swaying to music so loud a noise complaint had been made, and flashing a pistol in the direction of the deputy provided a reasonable basis to detain him, at least until the deputies could determine whether he was a danger to himself or others. Given these specific and articulatable facts, Deputy Johnson was justified in drawing his weapon and ordering Lyons to drop his gun. And once Lyons falsely denied having a gun, refused multiple times to comply with the deputy's instructions, and started walking away from the deputies, those facts provided the deputies with a further basis to place him in handcuffs and pat him down for weapons. Thus, because this detention was justified, the firearm discovered during the search of Lyons's person should not be suppressed.

## III. RECOMMENDATION

In conclusion, the undersigned finds that the deputies' entry onto the driveway of 7941 Meadow Vale Drive was permissible, and that the subsequent detention and pat down of Lyons was supported by reasonable suspicion. Accordingly, the undersigned recommends denying Lyons's Motion to Suppress.

Respectfully submitted,

s/ Tu M. Pham
TU M. PHAM
Chief United States Magistrate Judge

April 8, 2026
Date

### NOTICE

**WITHIN FOURTEEN (14) DAYS AFTER BEING SERVED WITH A COPY OF THIS REPORT AND RECOMMENDED DISPOSITION, ANY PARTY MAY SERVE AND FILE SPECIFIC WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS AND RECOMMENDATIONS. ANY PARTY MAY RESPOND TO ANOTHER PARTY'S OBJECTIONS WITHIN FOURTEEN (14) DAYS AFTER BEING SERVED WITH A COPY. FAILURE TO FILE OBJECTIONS WITHIN FOURTEEN (14) DAYS MAY CONSTITUTE A WAIVER AND/OR FORFEITURE OF OBJECTIONS, EXCEPTIONS, AND FURTHER APPEAL.**